NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0016n.06

No. 13-1444

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 13, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| THOMAS DAILEY, ET AL., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| LISA MEDLOCK, ET AL. | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |

BEFORE:    COLE and CLAY, Circuit Judges; BERTELSMAN, District Judge.*

BERTELSMAN, District Judge.   Plaintiffs-Appellants, a group of twenty-one individual and trust investors, appeal the district court's dismissal of their securities fraud complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Because we conclude that the complaint fails to state viable federal claims under the applicable pleading standards, we affirm in part, but we reverse the dismissal with prejudice of plaintiffs' claim for silent fraud under Michigan law.

---

*The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

*No 13-1444*
*Dailey v. Medlock*

## I. BACKGROUND

**A.   The Stock Offering**

On July 16, 2009, Community Central Bank Corporation issued a Private Placement Memorandum ("PPM") in order to raise up to $2,500,000 in gross proceeds for its sole asset, the Community Central Bank.[1] The PPM was supplemented on October 19, 2009, and December 16, 2009, in order to increase the amount of the offering to $5,000,000 and to extend the cut-off date for investors to purchase the "Series B Cumulative Convertible Perpetual Series B Preferred Stock" being offered.

This was a private stock offering; the shares were not to be listed on any securities exchange. Shares were priced at $1,000 with a minimum purchase of 250 shares. Prospective buyers were required to qualify as "Accredited Investors," defined in the accompanying Subscription Agreement as persons or entities meeting certain financial criteria, such as having an individual net worth exceeding $1,000,000 or an annual income of more than $250,000.

Between November 2009 and January 2010, Plaintiffs signed Subscription Agreements to buy varying amounts of the stock, with the actual sales taking place on December 31, 2009 and January 29, 2010. Plaintiffs' money was briefly held in escrow by CCB pending completion of these transactions.

---

[1] The Corporation and the Bank are referred to collectively as "CCB." Docket numbers ("Doc.") are those of the district court's electronic filing system.

*No 13-1444*
*Dailey v. Medlock*

## B.     The Bank's Financial and Regulatory Troubles

On March 29, 2010, the Michigan Office of Financial and Insurance Regulation ("OFIR") issued a "Report of Examination" on the Bank, identifying alleged "violations of law, rules, and regulations."

On March 31, 2010, CCB reported over $10 million in losses for the fourth quarter of 2009. Approximately $5.9 million of this loss was attributable to a "valuation allowance" on CCB's net deferred tax assets, described as a "one-time non-cash charge to federal income tax expense." This valuation allowance accounted for "approximately 60% of the operating loss for the fourth quarter [of 2009] and 40% of the loss for 2009."

On November 1, 2010, CCB entered into a Consent Order with the FDIC and the Michigan OFIR. CCB agreed to the Order "without admitting or denying any charges of unsafe or unsound banking practices relating to weaknesses in asset quality, earnings, and capital and without admitting or denying any violations of law, rule, or regulation." CCB agreed, among other things, to retain "qualified management"; operate the Bank in a "safe and sound manner"; retain an independent third party to develop a management plan; increase Board participation in the Bank's affairs; adjust its level of working capital; cease extending loans to certain borrowers; adopt a plan to increase liquidity; and "eliminate and/or correct all violations of law, rule, and regulations listed in the ROE."

In April 2011, the Bank failed and was placed into receivership.

## C.     Litigation Ensues

Plaintiffs filed their complaint in the United States District Court for the Eastern District of Michigan on February 9, 2012, naming as defendants thirteen individual CCB officers and directors.

*No 13-1444*
*Dailey v. Medlock*

On June 1, 2012, defendants filed a motion to dismiss, and plaintiffs then filed the First Amended Complaint.

The FAC alleges five causes of action: (1) violation of Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5; (2) violation of Section 20(a) of the Exchange Act; (3) violation of the Michigan Uniform Securities Act; (4) breach of fiduciary duty under Michigan law; and (5) silent fraud under Michigan law.

The FAC alleges generally that the PPM "made statements about the financial condition of CCB that failed to correctly describe CCB's financial condition as of the fourth quarter of 2009, when Plaintiffs were deciding whether to purchase CCB Preferred Stock." Specifically, plaintiffs allege that CCB represented in the PPM that the Bank was "well capitalized" and that its president painted a "rosy picture" about the Bank's performance in public statements, but that these statements were "inaccurate, misleading, or insufficient" due to various alleged material omissions.

As to the alleged omissions, plaintiffs allege that defendants knew or should have known, but failed to disclose in the PPM or its supplements, that CCB intended to take the valuation loss and thus incur large losses for the fourth quarter of 2009; that the Bank was engaged in ongoing violations of law, rules, or regulations, as well as "risky banking practices"; and that defendants "failed to adequately disclose CCB's accurate financial condition" in the PPM, its supplements, and CCB's public filings.

Defendants then filed a new motion to dismiss.

On March 30, 2013, the district court entered an Opinion and Order granting defendants' motion to dismiss. The court organized the misrepresentations or omissions alleged by plaintiffs

*No 13-1444*
*Dailey v. Medlock*

into nine categories: (1) that the Bank was "well capitalized"; (2) the failure to disclose the valuation allowance before it was taken; (3) the existence of the OFIR investigation; (4) the ongoing violations of law and regulations; (5) the ongoing risky banking practices; (6) negative projections for loan losses and analyses; (7) loan-to-collateral ratio; (8) defendant Widlak's statements; and (9) the overall financial health of the Bank.

For each of these nine categories, the district court held that plaintiffs had failed to allege, with the requisite specificity, facts that would support a finding of falsity; facts that would establish a duty to disclose the alleged material omissions; or facts that would support a "strong inference" of scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The district court then held that, absent an adequately pleaded claim for a predicate securities law violation, plaintiffs could state no claim for control person liability under Section 20(a).

Third, the court held that plaintiffs had not adequately pleaded a claim under the Michigan Uniform Securities Act, reasoning that the same analysis applicable to the federal claims controlled those state claims.

Fourth, the court held that plaintiffs' claim for breach of fiduciary duty failed because the facts as pleaded established that defendants fulfilled the only duty owed to plaintiffs: to hold their money in escrow and then apply it to the purchase of the securities.

Finally, the district court held that plaintiffs' claim for "silent fraud" under Michigan law was deficient because plaintiffs had failed to plead any affirmative duty on defendants' part to disclose the information plaintiffs alleged was improperly omitted. The district court then entered judgment in defendants' favor.

5

*No 13-1444*
*Dailey v. Medlock*

Plaintiffs timely appealed. (Doc. 40).[2]

## II. STANDARD OF REVIEW

This court reviews de novo the district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint in the light most favorable to the plaintiff and accepting all well-pleaded factual allegations as true. *See, e.g., Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467–68 (6th Cir. 2011).

## III. ANALYSIS

**A.     Section 10(b) and Rule 10b-5 Liability**

Section 10(b) of the Securities Exchange Act and Rule 10b-5 make it unlawful for any person, in connection with the purchase or sale of any security, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (citation omitted).

"A private right of action for violations exists where a plaintiff can demonstrate the following elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009) (citations and internal quotation marks omitted).

---

[2]Plaintiffs have not appealed the district court's dismissal of their Michigan statutory securities claim or their breach of fiduciary duty claim.

*No 13-1444*
*Dailey v. Medlock*

"Because § 10(b) claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply." *Id.* (citing *Frank v. Dana*, 547 F.3d 564, 569–70 (6th Cir. 2008)). "Thus, the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* At 942–43 (citation and internal quotation marks omitted).

Under the PSLRA, the complaint must also "specify each statement alleged to have been misleading," specify "the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 943 (quoting 15 U.S.C. § 78u–4(6)(1), (2)).

"Pleadings falling short of the PSLRA's heightened standard 'shall' be dismissed." *Ricker v. Zoo Entm't, Inc.*, — F. App'x —, 2013 WL 4516095, at *4 (6th Cir. Aug. 27, 2013) (quoting 15 U.S.C. § 78u-4(b)(3)).

The requirement that a misleading statement or omission be "material" is satisfied when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 131 S. Ct. at 1318 (citation and internal quotation marks omitted).

The Supreme Court recently emphasized that "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 1321. "Even with respect to information that a

7

*No 13-1444*
*Dailey v. Medlock*

reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Id.* at 1322.

To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 1323 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)).

"Under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 1324 (quoting 15 U.S.C. § 78u-4(b)(2)(A) (Feb. 2011 Supp.)). "This standard requires courts to take into account 'plausible opposing inferences.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323).

A complaint adequately pleads scienter under the PSLRA only if a reasonable person would deem the inference of scienter "cogent and at least as compelling as any opposing inference one could draw from the facts." *Id.* "In making this determination, the court must review 'all the allegations holistically.'" *Id.* (quoting *Tellabs*, 551 U.S. at 321).

**B.     Application to Plaintiffs' Allegations**

On appeal, plaintiffs pursue only three of the nine categories of alleged misstatements or omissions identified by the district court.

        **1.     Valuation Allowance**

Plaintiffs' first argument is based on the following statement in the PPM: "We are required by federal and state regulatory authorities to maintain adequate levels of capital to support our operations." Plaintiffs do not allege that this statement is false on its face. Rather, they theorize

8

*No 13-1444*
*Dailey v. Medlock*

that the statement "indicates" that CCB was "actually maintaining 'adequate levels of capital' throughout 2009." They then argue that this implication was rendered false and/or misleading because defendants failed to disclose, in the PPM or its supplements, the valuation allowance[3] that was taken at the end of 2009.

One cannot disclose an event which has not yet occurred. Plaintiffs' theory is thus really that defendants knew that the allowance would be taken but they failed to disclose that information.

While plaintiffs make an assertion of such actual knowledge in their appellate brief, the FAC itself alleges no facts, much less "highly particularized facts," to support that contention. Plaintiffs allege only generally that defendants were "aware" of "significant, unreported losses," but they do not allege that defendants had decided that the valuation loss would be taken or when, or even that any projections had been made which would make such a decision probable.

Indeed, as defendants note, as late as November 13, 2009, when CCB filed its Form 10-Q for the third quarter, CCB discussed in detail the analysis underlying the decision to take a valuation allowance, management's application of those factors to CCB's performance through the end of

---

[3] A "valuation allowance" should be taken, under accounting standards, when a company determines that, "based on the weight of available evidence, it is *more likely than not* (a likelihood of more than 50 percent) that some portion or all of deferred tax assets will not be realized in the future." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010) (internal quotation marks omitted). "This is a very subjective standard." *Id.*; *see also Valuation Allowance*, wikinvest (Nov. 5, 2013, 11:53 AM EDT), http://www.wikinvest.com/wiki/Valuation_Allowance ("If a company expects there is more than 50% chance it will not be able to realize some of its deferred tax assets (because its future income won't be large enough to take full advantage of these tax breaks), it must report a *valuation allowance* to account for this. . . . A valuation allowance depends a great deal on management assumptions - who's to say how high a company's future profits will be, and therefore whether the company will be able to take advantage of its deferred tax assets?").

9

*No 13-1444*
*Dailey v. Medlock*

September 2009, and the fact that CCB had determined not to take a valuation allowance for that quarter. CCB also stated, however:

> The deferred tax assets will be analyzed quarterly for changes affecting if the asset can be realized, and there can be no guarantee that a valuation allowance will not be necessary in future periods. Should a valuation allowance be necessary in future periods, it could further adversely affect our financial position and results of operations.

This 10-Q was filed approximately one month before plaintiffs began executing the agreements to purchase CCB stock.

With no facts alleged to support the contention that defendants had prior knowledge that a valuation allowance would be taken for the fourth quarter of 2009, plaintiffs make the *ipso facto* assertion that the mere fact that it ultimately was taken demonstrates such knowledge. It is hard to imagine a clearer example of alleging "fraud by hindsight." *See La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) ("Finding scienter based on such allegations would be equivalent to 'the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly.'") (citation omitted).

Plaintiffs' reliance on *Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011), and its predecessor opinion, does not advance their cause. Plaintiffs string together several quotations from these two cases, one of which mentions a valuation allowance, and conclude by quoting the court's statement that it was "uncontested" that the defendants there made "false statements." However, the fact that the company in that case had taken a valuation allowance was mere background – the court did not

10

*No 13-1444*
*Dailey v. Medlock*

discuss it in relation to its determination that plaintiffs had adequately pleaded their securities claim and, more specifically, scienter.

Further, unlike in this case, the plaintiffs in *Frank* pleaded specific sources of information from which defendants would have gained actual knowledge that their public statements concerning the company's operations were in conflict with the actual facts. *Frank*, 646 F.3d at 959–61. The complaint here lacks such factual allegations regarding the valuation allowance.

Therefore, the district court correctly held that plaintiffs' allegations concerning the valuation allowance failed to state a securities fraud claim.

### 2. "Well Capitalized"

Plaintiffs' second argument is based on defendants' statements in the PPM and three SEC filings between May 6 and November 10, 2009, that the Bank was "well capitalized." Plaintiffs assert that these statements were false or misleading because defendants failed to disclose that they were engaged in the "risky business practices" that were the subject of the OFIR investigation. This theory is fundamentally flawed.[4]

As the district court noted, the description "well capitalized" is a term of art under applicable federal banking regulations. *See* 12 C.F.R. § 325.103. Those regulations establish four financial classifications based on a bank's total risk-based capital ratio: "well capitalized," "adequately capitalized," "undercapitalized," and "significantly undercapitalized." *Id.* These labels either apply

---

[4]Defendants are also correct when they point out (Appellees' Brief at 20 n.13) that plaintiffs did not base their "well capitalized" claim on the OFIR report and "risky business practices" theory before the district court. Rather, they based it on the allegation that defendants failed to disclose "massive losses" that the Bank was suffering.

11

*No 13-1444*
*Dailey v. Medlock*

or they don't; if the bank meets the regulatory criteria to be "well capitalized," then it cannot be false or misleading for it to so describe itself.

Importantly, plaintiffs do not allege that the Bank did not meet these regulatory criteria at the time it described itself as "well capitalized." Rather, they allege that the statement was misleading given that the Bank was being investigated by the OFIR for allegedly poor business practices. This argument confuses apples and oranges: such allegedly poor business practices speak to a general assessment of the integrity of the bank's operations, a question separate from whether the Bank's then-current capital profile qualified it as "well capitalized" in the eyes of the government. In fact, the PPM specifically stated that the term "well capitalized" was being used pursuant to "applicable regulatory capital guidelines."

Moreover, as the district court noted, the statement that the Bank was "well capitalized" was placed in the context of both its need for additional capital as well as the poor economic forecast:

> The primary purpose of this offering is to strengthen our capital position. While we remained "well capitalized" as of March 31, 2009 under applicable regulatory capital guidelines, the market outlook for continuing weak economic conditions requires that we take all necessary steps to achieve higher capital levels that will position us to remain strong throughout the remainder of the current industry crisis.

"The context of statements is often telling." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005) (citation omitted).

In fact, it bears noting that eleven of the PPM's twenty-three pages are devoted to a discussion of the risks related to CCB's business and the Bank itself. These are not boilerplate cautionary statements. Rather, these pages detail adverse business conditions specific to CCB based on its high-risk loan portfolio; they forecast a continued deterioration in loan delinquencies, credit

12

*No 13-1444*
*Dailey v. Medlock*

losses, and profits; they note that a change in the regulatory "capitalization" rating would impair the Bank's borrowing position; and they explain in detail that the Series B Preferred Stock offered through the PPM was junior to all other indebtedness such that its holders would be "last in line" in the event the Bank went into bankruptcy, liquidation, or wind-up.

Finally, when the Bank's capital profile changed such that it qualified only as "adequately capitalized," it accurately reported that change in its Fourth Quarter 2009 filings in March 2010.

The district court thus correctly concluded that this allegedly false or misleading statement fails to support a Rule 10b-5 claim.

### 3.  "**Subject to Government Regulations**"

Plaintiffs' third argument in support of their Rule 10b-5 claim is premised on the statement in the PPM that the Bank's operations are "subject to extensive regulation by federal, state and local governmental authorities and are subject to various laws and judicial and administrative decisions imposing requirements and restrictions on part or all of our operations."[5]

On its face, this is obviously an accurate statement – banks are indeed subject to a plethora of laws and regulations. Nonetheless, plaintiffs argue that this statement was "designed to mislead" them because defendants did not disclose that they were violating laws and regulations and were under investigation by the OFIR.

---

[5] The district court correctly noted that this statement from the PPM was not identified in the First Amended Complaint as an allegedly false or misleading statement upon which plaintiffs premised their claims. Instead, plaintiffs appear to have first zeroed in on the statement in their response in opposition to the motion to dismiss. The district court nonetheless addressed this theory, so we do likewise on appeal.

13

*No 13-1444*
*Dailey v. Medlock*

The district court properly rejected this theory. First, the above statement merely says that the Bank is "subject" to laws and regulations; it does not state that the Bank believes it is in compliance with such laws. Even if it did, this Circuit's precedent holds that a generic claim of legal compliance, absent any specifics, does not form the basis for a misrepresentation actionable under Rule 10b-5 and does not require the disclosure of allegedly illegal activities. *See Omnicare*, 583 F.3d at 945–47; *see also Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 826–27 (8th Cir. 2003) (statement that company was in "substantial compliance" with Medicare regulations did not support Rule 10b-5 claim where plaintiffs failed to allege particular facts demonstrating that defendants then knew of scheme which violated those regulations).

Moreover, while plaintiffs reference the OFIR investigation, they do not plead what, if any, laws or regulations defendants violated such that a statement of legal compliance (again, which defendants did not make) would have been false or misleading. *Cf. Bridgestone*, 399 F.3d at 672–73 (finding statement regarding safety of company's tires to be actionable where company had actual knowledge of internal tests regarding tire failures).

For these reasons, the district court properly held that these allegations did not sufficiently plead a statement actionable under Rule 10b-5.

**C.     Control Person Liability**

Where plaintiffs do not state a claim for a primary securities law violation under Rule 10b-5, dismissal of a "control person" liability claim under 15 U.S.C. § 78t(a) is also proper. *Omnicare*, 583 F.3d at 947.

The district court thus correctly dismissed plaintiffs' § 20 claim.

14

*No 13-1444*
*Dailey v. Medlock*

### D.    Michigan Claim for "Silent Fraud"

"Under Michigan law, 'in order to prove a claim of silent fraud, a plaintiff must show that some type of representation that was false or misleading was made and that there was a legal or equitable duty of disclosure.'" *Tocco v. Richman Greer Prof'l Ass'n.*, 912 F. Supp. 2d 494, 526 (E.D. Mich. 2012) (quoting *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 39 (Mich. Ct. App. 1998)).

"'Mere silence is not enough to sustain a silent fraud cause of action. Instead, a plaintiff must establish that the defendant intentionally suppresse[d] material facts [in order] to create a false impression.'" *Id.* (citation omitted).

"Accordingly, the touchstone of liability for misdirection or 'silent fraud' is that *some* form of representation has been made and that it was or proved to be false." *M&D*, 585 N.W.2d at 38 (citation omitted).

"A legal duty to make a disclosure 'will arise most commonly in a situation where inquiries are made by the plaintiff, to which the defendant makes incomplete replies that are truthful in themselves but omit material information.'" *MacDonald v. Thomas M. Cooley Law Sch.*, 880 F. Supp. 2d 785, 798 (W.D. Mich. 2012) (alteration omitted) (quoting *Hord v. Envtl. Research Inst. of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) (per curiam)).

Case law does not suggest that the silent fraud analysis under Michigan law mirrors that of a Rule 10b-5 claim. Nonetheless, the two causes of action undoubtedly share common elements.

However, it is not clear how the Michigan state courts would treat this claim, if brought before them.

15

*No 13-1444*
*Dailey v. Medlock*

The district court dismissed plaintiffs' silent fraud claim with prejudice. Although the district court had supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367, that statute also provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim . . . if –
> 
> (1) the claim raises a novel or complex issue of State law, [or] . . .
> 
> (3) the district court has dismissed all claims over which it has original jurisdiction.

Both of these criteria apply, and we conclude that the silent fraud claim should be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c). *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521–22 (6th Cir. 2007).

## IV. CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand this case for proceedings consistent with this opinion.

# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: January 13, 2014

Mr. Howard William Burdett Jr.
Boyle Burdett
14950 E. Jefferson
Suite 200
Grosse Pointe Park, MI 48230

Mr. Steven M. Ribiat
Brooks Wilkins Sharkey & Turco
401 S. Old Woodward Avenue
Suite 400
Birmingham, MI 48009

    Re:  Case No. 13-1444, *Thomas Dailey, et al v. Lisa Medlock, et al*
          Originating Case No. : 2:12-cv-10586

Dear Sir or Madam,

  The Court issued the enclosed (Order/Opinion) today in this case.

                              Sincerely yours,

                              s/Benjamin P. Alexander
                              Case Manager
                              Direct Dial No. 513-564-7021

cc:  Mr. David J. Weaver

Enclosure

Mandate to issue